IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | CRIMINAL NO. 18-31 |
| | ) | |
| | ) | CHIEF JUDGE JOY FLOWERS CONTI |
| | ) | |
| vs. | ) | |
| | ) | |
| **AMBROSE J. SAMPLE, II,** | ) | |
| | ) | |
| Defendant, | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Ambrose J. Sample, II ("Sample") is charged in a two-count indictment at Criminal No. 18-31 with: (1) at count 1, possession of ammunition by a convicted felon on June 17, 2017, in violation of 18 United States Code § 922(g)(1); and (2) at count 2, possession of a firearm by a convicted felon on June 17, 2017, in violation of 18 United States Code § 922(g)(1). On January 9, 2019, with the advice of his attorney, Sample knowingly and voluntarily waived his right to a jury trial in writing (ECF No. 55), and the government consented to his waiver of a jury trial in this case. The court, therefore, approved the waiver of a jury trial and proceeded with a non-jury trial. Tr. 9-10 (ECF No. 56).

In accordance with Federal Rule of Criminal Procedure 23(c), the court hereby enters a written decision with its findings of fact and conclusions of law. The government must prove defendant's guilt beyond a reasonable doubt. For the reasons set forth below, the court finds Sample guilty on count 1 and not guilty on count 2.

## FINDINGS OF FACT

1. The government called the following witnesses: Stephanie Johnson ("Johnson"), Shalena Lewis ("Lewis"), Aaron Burton ("Burton"), officer Joseph Bucci ("Bucci"), detective Joseph Lippert ("Lippert") and Special Agent Maurice Ferentino

("Ferentino"), who was qualified as an expert on firearms and ammunition identification and interstate nexus. Tr. 160. Government exhibits 1-11 were admitted into evidence.

2. Sample testified on his own behalf, after a colloquy to ensure that his waiver of his right not to testify was knowing and voluntary. Tr. 173-176.

3. The parties stipulated that at the time of the incident, Sample had four prior convictions for crimes punishable by more than one year in prison (Govt. Exh. 3-6).

4. Although defense counsel ably demonstrated some minor inconsistencies among the eyewitnesses and discrepancies between the testimony in this case and their prior statements, there was agreement on the essential events at issue.

5. Lewis, Burton and their children lived at 307 Kennedy Avenue in the Northside neighborhood of Pittsburgh, PA for over ten years.

6. Sample and his former girlfriend, Felicia Ford ("Ford"), previously lived together at 267 Kennedy Avenue in the Northside neighborhood of Pittsburgh, PA (the "Kennedy home"), approximately five or six houses (50 or 60 yards) away. Tr. 93, 192. Lewis and Burton were familiar with Sample and Ford from seeing them on the street. Tr. 56-57, 78.

7. Sample lived alone at the Kennedy home for approximately ten months prior to the June 2017 incident after his release from prison. Tr. 200.

8. Ford had married another man while Sample was in jail and lived with her husband on N. Charles Street, also in the Northside neighborhood of Pittsburgh, PA. Tr. 200.[1]

9. Sample subleased the Kennedy home from Ford, although he paid the rent directly to the owner. Sample was the only person Ford allowed to live in the Kennedy home. Tr. 200.

---

[1] Although Lewis and Burton testified that Ford still lived at the Kennedy home on the date of the incident, Tr. 56, 78, Sample's testimony is more credible about this fact. When officers searched the Kennedy home, they found no indicia that Ford lived there. Tr. 115.

10. Sample spent from 4:30 p.m. to 9:30 p.m. on June 17, 2017, drinking heavily with his neighbor. Sample and two friends consumed four cases of beer, two big bottles of E&J Peach, and quantities of fireball liquor. Sample also took Percoset, while aware that it was not to be taken with alcohol. Tr. 202-04. At the time of the incident, Sample was deeply depressed and a full-blown alcoholic. Tr. 202.

11. Because of this level of inebriation, Sample's recollection of the events that evening has reduced credibility.

12. On June 17, 2017, at approximately 9:40 p.m., Lewis was driving her car to return to her home. Tr. 51. With Lewis in the car that evening were her friend, Johnson, her nine- and sixteen-year-old daughters, and a nine-year-old neighbor. Tr. 22-23.

13. Because it was a clear evening, there was still light and visibility was unimpaired. Tr. 24, 39, 69, 88. The court takes judicial notice that the incident occurred close to the summer solstice.

14. Near the intersection of Kennedy Avenue and Norwood Avenue, Sample stepped into the street directly in front of Lewis' car. Sample did so because Lewis was speeding and he was concerned for the safety of children in the neighborhood. Tr. 178.

15. Lewis initially laughed when Sample stepped in front of her car, but grew concerned for her safety when he pulled a firearm out of his waist. Tr. 42. She described the gun as black, with a reflector or something on the top part of the gun. *Id*. Lewis instructed her daughter in the back seat to call the police without letting Sample see the phone. Tr. 42.

16. Lewis and Sample exchanged words. Johnson saw a small black gun with silver on it in Sample's hand. Tr. 28. Johnson identified Sample in court as the person who stepped in front of the car on June 17, 2017. Tr. 24-25.

17. During the altercation, Lewis saw Ford standing in the doorway of Sample's house. Tr. 57.

18. Eventually, Sample moved out of the way and Lewis sped through the stop sign, quickly drove to her house, parked on the street and yelled for Burton to help her get the children inside. Tr. 43-44. She saw Sample walking toward her in the rearview mirror.

19. Burton was watching TV on the evening of June 17, 2017, when he heard Lewis and the children arrive, yelling about someone chasing them about a gun. He ran outside, looked up the street and saw about five or six men, including Sample, leaning against a white truck a short way down the street. Tr. 71-72.

20. Burton clearly saw Sample reach into his waistband, pull out a black gun and fire it into the air four or five times, while shouting: "This is what I'm about." Tr. 74-75, 84. Burton described the gun as pretty big, like a .45 caliber or 9 millimeter handgun. Tr. 74.

21. Lewis and Johnson agreed that shots were fired, but disagreed about exactly when it occurred. Lewis testified that she heard gunshots as she was trying to get her children out of the car and into the house and in her peripheral vision saw Sample firing shots by the stop sign. T. 45. Johnson testified that after the children were taken inside, she came back out and saw Sample firing three or four gunshots from the area of the stop sign. Tr. 30-31. This minor discrepancy in the timing of swift-moving events does not adversely affect the credibility of Lewis' and Johnson's testimony.

22. Lewis immediately called 911 and reported a man following her with a gun. Tr. 46. Lewis also told the 911 operator that two men put guns in the back of a white SUV and that Sample had a "long gun." Tr. 53-54.

23. Bucci was the first officer to respond to the scene after the "shots fired" call came in. He first interacted with three males, including Sample, who denied hearing any gunshots. Tr. 88-89.

24. At that time, Sample was standing near a white van, across the street from 267 Kennedy Avenue. Tr. 91.

25. Bucci spoke to the victims, about 60 yards away and they identified Sample as the shooter. Tr. 90.

26. Bucci saw Sample go inside the home at 267 Kennedy and started back in that direction. Before reaching Sample's home, Bucci received an unrelated emergency call and had to leave the scene. Tr. 92.

27. After his interaction with Bucci, Sample walked to the store to get cigarettes for Ford. Tr. 182.

28. Lippert encountered Sample shortly thereafter on Perrysville Avenue, which is in walking distance from Kennedy Avenue. Sample was unarmed and immediately informed Lippert that he had prior felony convictions and was not permitted to possess a firearm. Tr. 129. Lippert observed that Sample was intoxicated. Tr. 127. Lippert put Sample in handcuffs and performed a gun residue test on his hands, which was positive. (Tr. 131-35, Govt. Ex. 11).

29. Minutes later, Bucci met Lippert on Perrysville Avenue and identified Sample as the same person he saw on Kennedy Avenue. Tr. 99.

30. Bucci took Lewis in his police car and drove past the location on Perrysville Avenue where Sample was detained to see if Lewis could identify Sample as the same person she saw with a gun on Kennedy Avenue. After Lewis positively identified Sample, Bucci brought her back home. Tr. 100-101.

31. Ford's car, a sporty white Hyundai Sonata four-door with tinted windows, had been parked outside Sample's house. Tr. 61, 78. Lewis saw Sample stand by the vehicle after the shooting incident. Tr. 60.

32. When Bucci returned to Kennedy Avenue, he learned that a female left 267 Kennedy in a white Hyundai with tinted windows. Tr. 102. Burton did not see the driver

because of the tinted windows, and he saw the car being driven away soon after Bucci and Lewis left to identify Sample. Tr. 78-79, 82.

33. The officers did a protective sweep of 267 Kennedy and secured it. Tr. 102-103. Bucci left to prepare a search warrant affidavit. Tr. 103.

34. On the way, Bucci drove past Ford's home on 2532 N. Charles Street and saw a white Hyundai. The hood was warm, as if the vehicle was recently driven. Tr. 103. The search warrant covered 267 Kennedy, 2532 N. Charles Street, and the Hyundai. Tr. 104.

35. Upon executing the search warrant at 267 Kennedy, Lippert recovered a .380 caliber round sitting all by itself on the mantelpiece above the fireplace in the living room. Tr. 138, 148-49.

36. The officers did not find a firearm in the home at 267 Kennedy. Tr. 139.

37. Officers searched for but did not recover any shell casings from the scene of the incident on Kennedy Avenue. Tr. 92, 110.

38. The officers executed the search warrant for 2532 N. Charles Street at 3:00 a.m. They found Ford asleep in an upstairs bedroom and recovered a silver, two-tone semiautomatic 9 mm pistol (Govt. Exh. 1) from under the mattress on which Ford was sleeping. Tr. 143.

39. Johnson, Lewis, Burton, Bucci and Lippert positively identified Sample in court as the person with whom they interacted on June 17, 2017. Tr. 24-25, 40, 73-74, 89, 127. Johnson, Lewis and Burton testified credibly that Sample possessed a firearm that evening.

40. There was no evidence presented to support each link in the chain of custody of a firearm from Kennedy Avenue to N. Charles Street. No one saw Sample give a firearm to Ford or saw Sample place a firearm in her car. Lewis told the 911 operator

she saw firearms being put in a different vehicle. Tr. 53. No one saw Ford in possession of a firearm at Kennedy Avenue.

41. No spent shell casings were found that could have tied the recovered firearm to the shooting on Kennedy Avenue. (Tr. 92). No evidence was presented that the firearm recovered from Ford's home was fired earlier that evening.

42. No evidence was presented regarding Sample's ownership of the firearm recovered from Ford's home or that his fingerprints were on it.

43. No evidence was presented that Sample exercised dominion or control over the 2532 N. Charles Street home.

44. No one testified that Govt. Exh. 1 was the same firearm Sample possessed on June 17, 2017.

## **CONCLUSIONS OF LAW**

1. Congress provided: "It shall be unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).

2. The elements of the crimes charged in counts 1 and 2 are not in dispute. The government must prove, beyond a reasonable doubt, that: (1) defendant was convicted of a felony; (2) after this conviction, defendant knowingly possessed ammunition or a firearm; and (3) defendant's possession was in or affecting interstate commerce. *United States v. Higdon*, 638 F.3d 233, 239-40 (3d Cir. 2011) (citing *United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000)).

3. The first element is not in dispute. The parties stipulated that Sample was a convicted felon, who was prohibited from possessing a firearm or ammunition on June 17, 2017. Tr. 176.

4. The government can prove "possession" of a firearm or ammunition to support a conviction under § 922(g)(l ) in two ways: "(1) by showing that the defendant exercised direct physical control over the weapon (actual possession), or (2) by showing that he exercised dominion or control over the area in which the weapon was found (constructive possession)." *See United States v. Caldwell*, 760 F.3d 267, 278 (3d Cir. 2014).

5. "Constructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both dominion and control over an object and knowledge of that object's existence." *United States v. Walker*, 657 F.3d 160, 172 (3d Cir. 2011) (citations omitted).

6. The law also recognizes that possession may be sole or joint. If one person alone possesses a firearm, that is sole possession. More than one person, however, may have the power and intention to exercise control over a firearm or ammunition, which is referred to as "joint possession." Mere proximity to the firearm or ammunition or mere presence on the property where it is located or mere association with the person who does control the firearm or ammunition, is insufficient to support a finding of possession. *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993).

7. During the trial, the court granted the government's objection to questions posed to Lippert about an alleged inconsistent statement made by Burton (whether Sample aimed the firearm toward Burton's home or fired it into the air). Tr. 150-56. The defense was given the opportunity to challenge that ruling in its post-hearing brief. Tr. 156, 220. The defense failed to do so. Defendant's objection to the ruling is, therefore, waived. *See Xian Chen Chen v. Attorney Gen. of United States*, 732 F. App'x 167, 168 n. 4 (3d Cir. 2018) (appeal of an issue is waived where petitioner failed to raise the issue in briefing). The court notes that, in any event, the alleged inconsistency is not relevant to the elements of the charged crimes.

Count 1 - Ammunition

8. The defense argues that the government failed to prove that Govt. Exh. 2,[2] the apparent round of .380 ammunition recovered from Sample's home, falls within the statutory definition of "ammunition" because Ferentino did not disassemble it to verify that it contained an operable primer (igniter) and propellant powder (explosive) necessary to create an explosion to expel a projectile. (ECF No. 61 at 4-5, 14). The defense suggests that the item could have been a replica, theatrical prop, ornament or decoration, among other things. *Id*. at 5.

9. The defense cited no authority for this proposition, and the court could not locate any authority in its independent research.

10. Congress defined the term "ammunition" as "ammunition or cartridge cases, primers, bullets, **or** propellant powder **designed** for use in any firearm." 18 U.S.C. § 921(a)(17)(A) (emphasis added).

11. The statutory definition is broadly framed with the disjunctive "or" and does not require "ammunition" to contain a primer and explosive. *Id*. The statutory definition does not require that the ammunition be operable, only that it be "designed" for use in a firearm. *Id*.

12. In this case, Ferentino opined based on his training, experience and examination of the .380 round that it was manufactured by Fiocchi, the largest ammunition producer in Italy, probably at its plant in Missouri. Tr. 163. Fiocchi does not manufacture ammunition in Pennsylvania. Tr. 164. Ferentino further opined that the round would naturally fit a .380 caliber pistol. Tr. 164.

13. It was not necessary for Ferentino to disassemble the round to determine whether there was propellant in it. Tr. 165-66. It is sufficient that the round was made by an out-of-

---

[2] Defense counsel, the prosecutor and Bucci referred to Govt. Exh. 2 as a "bullet." Ferentino and Lippert referred to it as a "round" of ammunition. For clarity and consistency, the court will refer to it as a "round."

state ammunition company, designed for use in a firearm and identified by an expert as a round of ammunition. The round was not a replica, theatrical prop, ornament or decoration.

14. The court concludes that the .380 round (Govt. Exh. 2) meets the statutory definition of ammunition.

15. Sample constructively possessed the round of .380 caliber ammunition charged in count 1 of the indictment (Govt. Exh. 2). He was the sole occupant of the Kennedy home at the time of the search and for the preceding ten months and the ammunition was found in plain view on the mantelpiece in his living room inside the home, within Sample's dominion and control. *See United States v. Roebuck*, 242 F. App'x 882, 884 (3d Cir. 2007) (defendant had constructive possession of firearm and ammunition recovered from home where he lived alone at the time of the search); *United States v. Mirabal*, 876 F.3d 1029, 1038 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 2008 (2018) (evidence that officers found a firearm and ammunition in defendant's residence, where he lived alone, sufficed for guilt); *United States v. Cropper*, 168 F. App'x 503, 506 (3d Cir. 2006) ("The fact that the ammunition was left in the bedroom on top of the dresser creates an inference that [defendant] was aware of its existence and exercised constructive possession over it.").

16. There was no evidence presented at trial that the .380 round was possessed by Ford or another person. Even if such evidence existed, Sample would have jointly possessed the ammunition with that person.

17. Based on the uncontested expert opinion of Ferentino, the round of ammunition traveled in interstate commerce. Tr. 164.

18. The government proved all the elements of the crime charged at count 1 beyond a reasonable doubt.

19. The court finds Sample guilty on count 1 of the indictment at Criminal No. 18-31.

## Count 2 - Firearm

20. The government proved beyond a reasonable doubt that Sample possessed **a** firearm on June 17, 2017. Lewis and Johnson testified credibly that they saw him hold a firearm in his hand. Burton testified credibly that he saw Sample fire it into the air. Each of them positively identified Sample in the courtroom as the same person who possessed the firearm on that date. Sample tested positive for gun residue on his hands.

21. The government did not, however, prove beyond a reasonable doubt that the firearm Sample possessed on Kennedy Avenue at 9:40 p.m. on June 17, 2017, was the same firearm that police recovered from Ford's home on N. Charles Street at 3:00 a.m. on June 18, 2017, as charged in count 2 of the indictment.

22. None of the witnesses testified that the firearm charged in the indictment was the same firearm Sample possessed on June 17, 2017.

23. The description of the firearm by the eyewitnesses slightly varied. Johnson described a small black gun with silver on it; Lewis described a black gun with reflectors; and Burton described a "pretty big" black gun, like a 9 millimeter handgun. Tr. 28, 62, 74. Lewis told the 911 operator that Sample had a "long gun." Tr. 54.

24. The government's proposed chain of custody is attenuated– i.e., after shooting into the air around 9:40 p.m.: (a) Sample took the firearm either to his home or to Ford's car; (b) Ford took the firearm from the Kennedy location to her home on N. Charles Street; (c) Ford put the gun under her mattress; and (d) the officers recovered it approximately five hours later.

25. Where a defendant is charged with possessing a number of firearms, the government need not necessarily prove that the defendant possessed a specific firearm. As explained in *United States v. Verrecchia*, 196 F.3d 294, 299 (1st Cir. 1999):

> The plain language of the statute suggests that the element of the crime is simply the possession of "any firearm." If so, then twelve jurors who agreed that a defendant possessed a firearm, but disagreed about which particular one, would be unanimous on the element-that he possessed "any firearm."

Their disagreement would be acceptable because it would only concern "underlying brute facts."

*Id.* at 299 (citing *Richardson v. United States*, 119 S.Ct. 1707, 1710 (1999)). *Accord United States v. Korey*, Crim. No. 14-108, 2015 WL 238177 at *5 (W.D. Pa. May 19, 2015) (following *Verrecchia* and holding that a particular firearm is not an element of the crime).

26. In this case, however, the indictment charged that Sample possessed a specific firearm, namely, a 9mm SCCY pistol, bearing serial number 263360. (ECF No. 1). "It is a fundamental principle of our system of criminal justice that a defendant has a substantial right to be tried solely on the charges presented in an indictment returned by a grand jury." *United States v. Weissman*, 899 F.2d 1111, 1115 (11th Cir. 1990) (citing *United States v. Bizzard*, 615 F.2d 1080 (5th Cir. 1980)). "[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215–16, 217 (1960) (grounding defendant's right in the grand jury protections of the Fifth Amendment to the U.S. Constitution). Sample cannot be convicted, in this case, of possessing a different firearm.

27. In any event, the court need not resolve, in this case, all the complex legal issues relating to the identification of a specific firearm because the government failed to prove the third element of the offense beyond a reasonable doubt, i.e., interstate commerce.

28. The government proved that the firearm recovered from Ford's home (Govt. Exh. 1) travelled in interstate commerce. The government did not prove beyond a reasonable doubt that the firearm recovered from Ford's home was possessed by Sample on June 17, 2017, and no evidence was presented about whether the firearm possessed by Sample travelled in interstate commerce.

29. In *United States v. Lee*, 612 F.3d 170, 179 & n.8 (3d Cir. 2010), the court noted the government's evidence of interstate nexus in that case was equivocal. An ATF expert witness testified that there are no commercial manufacturers of firearms in Pennsylvania.

The expert also testified, however, that there are some private manufacturers of firearms in Pennsylvania and without examining the gun in question, he could not determine whether the gun was made by a private manufacturer or a commercial one. *Id*.

30. A similar analysis applies to this case. The government did not prove beyond a reasonable doubt that the firearm recovered from Ford's house and examined by Ferentino (Govt. Exh. 1) was the same firearm possessed by Sample on June 17, 2017. Sample may have possessed a different firearm that evening which was privately manufactured in Pennsylvania. Because the government did not prove beyond a reasonable doubt that Ferentino examined the weapon actually possessed by Sample, the court is unable to conclude that it travelled in interstate commerce. The government did not meet its burden to demonstrate beyond a reasonable doubt that Sample's firearm travelled in interstate commerce.
31. The court finds Sample not guilty on count 2 of the indictment at Criminal No. 18-31.
32. Because of the court's finding of guilty with respect to count 1, defendant's Rule 29 motion for acquittal as to count 1 is denied. His motion for acquittal with respect to count 2 is denied as moot.

The court will issue an order regarding the dates for the presentence investigation report and sentencing.

SO ORDERED this 21st day of March, 2019.

BY THE COURT:

/s/ Joy Flowers Conti
Judge Joy Flowers Conti
Senior United States District Judge